### State of Vermont v. Gordon Hunt

[485 A.2d 109]

No. 83-451

Present: Billings, C.J., Hill, Underwood, Peck and Gibson, JJ.

Opinion Filed May 11, 1984

Mandate Stayed May 29, 1984; Dissolved November 2, 1984

*Gregory W. McNaughton,* Barre, for Plaintiff-Appellee.

*Gaston & Durrance,* Montpelier, for Defendant-Appellant.

*Susan F. Eaton* of *Langrock Sperry Parker & Wool,* Middlebury, for amicus curiae American Civil Liberties Union, Vermont Chapter.

*Keyser, Crowley, Banse, Abell & Facey, Inc.,* Rutland, and *Joseph A. Dickinson,* Concord, New Hampshire, for amicus curiae Association of Assistant Judges.

*Joseph E. Frank,* President, *Vermont Bar Association,* and *William A. Nelson,* Montpelier, and *Dorsch and Hertz,* Brattleboro, for amicus curiae Vermont Bar Association.

**Underwood, J.** We are called upon to decide a question of first impression in Vermont: whether two lay assistant judges of the superior court,[1] constituting a majority of the superior court, have the power to overrule the lawyer trained, presiding judge by rejecting a proffered plea bargain agreement.

The defendant is charged with first degree murder; he has pled not guilty and has raised the defense of insanity or diminished mental capacity. Prior to trial the state's attorney, the defendant's attorney and the defendant each signed an instru-

---

[1] The office of Assistant Judges, or side judges as they are sometimes called, is included in the Vermont Constitution. The Legislature first delineated the judicial duties of the assistant judges in 1781. 1781 Vt. Acts (an Act Directing the Courts in Their Office and Duty, April 14, 1781).

ment entitled Plea and Sentencing Agreement (Agreement), which they submitted to the Chittenden Superior Court for its acceptance. V.R.Cr.P. 11(e). Pursuant to the Agreement, should the court agree to impose a minimum sentence of no more than ten years, and a maximum sentence of its own choosing, the defendant would agree to enter a plea of guilty to an amended charge of second degree murder.

The presiding judge would have accepted the Agreement for three reasons: first, it might be difficult for the State to prove premeditation; second, it might be difficult for the State to prove that the defendant was sane at the time of the offense; and finally, the State may have seized evidence against the defendant in violation of his constitutional guarantees. Although the presiding judge had previously denied the defendant's motion to suppress the evidence, he felt the final outcome on his ruling, if overturned on appeal, could deprive the State of the evidence necessary to prevail at trial.

The two assistant judges, comprising a majority of the court, rejected the Agreement, apparently because they could not condone the minimum sentence provision. Consequently the presiding judge noted upon the record, "The judgment of the Court is that the plea agreement as proposed is rejected." The presiding judge did not contest the assistant judges' authority to reject the Agreement.

Defendant moved for permission to appeal the ruling pursuant to V.R.A.P. 5(b). The State joined with the defendant in the motion. The controlling questions of law for review as set forth in the motion were substantially as follows:

> 1. Did the lay judges act beyond their jurisdiction,[2] as defined by *State* v. *Dunkerley* [134 Vt. 523, 365 A.2d 131 (1976)] and V.R.Cr.P. 54, in rejecting a plea agreement involving legal issues?

> 2. Are the defendant's rights to counsel and due process denied by giving lay judges jurisdiction to overrule a lawyer judge and reject a plea agreement involving legal issues?

---

[2] Although the parties use the term "jurisdiction," we do not address the issue as a jurisdictional question. We consider the issue as a challenge to the authority of the assistant judges.

3. Does rejection of the plea agreement by lay judges violate the defendant's right to equal protection?

The motion for permission to take an interlocutory appeal was granted. Thereafter both the State and the defendant filed briefs arguing that only the presiding judge could accept or reject the Agreement. Amicus curiae briefs also supporting the exclusive power of the presiding judge to make the ruling were filed by Vermont Chapter of the American Civil Liberties Union and by the Vermont Bar Association. An amicus curiae brief supporting the authority of the two assistant judges to reject the Agreement was filed by the Vermont Association of Assistant Judges.

I.

On appeal the defendant and the State both argue that the assistant judges, who are lay judges,[3] exceeded their authority when they overruled the lawyer trained presiding judge by rejecting the Agreement because it involved legal issues. To support their position they rely heavily upon *State* v. *Dunkerley*, 134 Vt. 523, 365 A.2d 131 (1976), and V.R.Cr.P. 54(c) (1) (ii).

*Dunkerley*, which involved a prosecution for first degree murder, also came before this Court on an interlocutory appeal. Although the defendant in *Dunkerley* challenged the constitutionality of permitting lay assistant judges to participate in a murder trial at all, we narrowed the issue on appeal as follows:

Is it a violation of due process to conduct a trial before a court consisting of a majority of lay judges authorized to adjudicate matters of law as well as fact?

*Id.* at 524, 365 A.2d at 131. The Court held that:

the possibility of a lay majority ruling on questions of law in a trial is a sufficient deviation of due process to require proscription. . . . [T]herefore, the Assistant Judges must be disqualified from participation in the *legal issues* relating to trial.

---

[3] We take judicial notice that at all times material each of the twenty-eight assistant judges in the State of Vermont was a lay judge. V.R.E. 201.

*Id.* at 526, 365 A.2d at 132 (emphasis added).[4]

*Dunkerley* in no way limited the authority of assistant judges to participate in deciding questions of fact in the sentencing process or in exercising judicial discretion in criminal cases. Shortly after the decision was handed down, the Supreme Court amended V.R.Cr.P. 54(c)(1)(ii) as follows:

> In superior court cases all questions of fact appropriate for decision by the court shall be determined by a majority of the judges, who shall also determine the facts involved in mixed questions of law and fact. Application of the law to the facts so found shall be determined by the Presiding Judge in each instance.

V.R.Cr.P. 54(c)(1)(ii). See Reporter's Notes (1976 Amendment). Thus, it is readily apparent that assistant judges have authority to participate in the trial of a criminal case in superior court, subject to specific limitations imposed on their authority by *Dunkerley* and by V.R.Cr.P. 54.

The litigants and the amicus curiae briefs seem to agree on these principles: (1) the assistant judges are disqualified from deciding legal issues in criminal cases; (2) the assistant judges may decide factual issues in criminal cases; and (3) absent a plea bargain agreement, the assistant judges may participate in the sentencing procedures. The area of disagreement involves acceptance or rejection of plea bargain agreements, which, some seem to infer, raise issues of law or at least mixed questions of law and fact. Only the briefs of the Assistant Judges' Association and the Vermont Bar Association point out that acceptance or rejection of the plea bargain agreement may only call for an exercise of discretion.

Although disputes of fact and of law may very well have been the impetus for plea bargaining between the parties, the Agreement itself, which was the culmination of those negotiations, contained no legal issues for the trial court to resolve in conjunction with its acceptance or rejection. The presiding judge had already ruled as a matter of law after suppression hearings that the purported murder weapon and the alleged

---

[4] A concurring opinion of one of the justices would have extended the holding to legal issues in civil cases as well.

confession of the defendant should be admitted into evidence at the time of trial.

Nevertheless, the State and the defendant contend that acceptance or rejection of the Agreement calls upon the ability of the lay assistant judges to recognize and understand the impact on this case of relevant case law, statutes, and federal and state constitutional standards. In addition, they argue, the lay judges must be able to evaluate the State's ability to prove the defendant's guilt beyond a reasonable doubt as well as to evaluate the merits of defendant's plea of not guilty and his defense of insanity or diminished mental capacity. Because of the complexity of these evidentiary and constitutional issues, both the State and the defendant insist that only a lawyer trained judge would be able to weigh intelligently the propriety and fairness of the Agreement.

The amicus curiae brief filed by the Vermont Association of Assistant Judges contends that the posture in which the Agreement was presented to the court did not call for a ruling of law, but rather for an exercise of discretion. It is further claimed in the brief that the reason the two assistant judges rejected the Agreement was because they focused exclusively on its dispositional or correctional phase—that is, whether a minimum sentence of ten years was appropriate in exchange for a plea of guilty to a reduced charge of second degree murder. It appears that the question foremost in their minds was whether upon his conviction for second degree murder the defendant should be sentenced to a minimum term of incarceration for ten years, or whether this sentence was too lenient. The same brief presupposes that the assistant judges in rejecting the proffered Agreement were aware that the litigants in drafting and executing the Agreement had taken into account the defendant's defense of insanity or diminished mental capacity, as well as the questionable admissibility of the murder weapon and defendant's confession, and therefore the only remaining issue for them to consider was the sentencing provision of the Agreement. We are mindful that one of the functions of judges, in accepting or rejecting a plea bargain agreement, "is to insure the appropriateness of the correctional disposition reached by the parties and to guard against any tendency of the prosecutor to overcharge or to be excessively

lenient . . . ." *The Challenge of Crime in a Free Society, A Report by the President's Commission on Law Enforcement and Administration of Justice* 136 (1967). Neither the litigants nor the amicus briefs have cited any instance where the assistant judges have been excluded from participating in sentencing procedures which required the exercise of judicial discretion.

 The trial court is not bound to accept a plea agreement. *State* v. *Reuschel,* 131 Vt. 554, 561–62, 312 A.2d 739, 743 (1973). See V.R.Cr.P. 11(e)(4); 13 V.S.A. § 6565(b). A court may reject a plea of guilty in the exercise of its sound judicial discretion. *Santobello* v. *New York,* 404 U.S. 257, 262 (1971). *Santobello* involved a guilty plea based on a plea bargain agreement. *Id.* at 261–62. With these principles in mind, we look to see whether *Dunkerley* or Rule 54 prohibits the participation of assistant judges in rejecting the Agreement.

 As previously noted, *Dunkerley* only limited assistant judges from ruling on legal issues raised during a criminal trial; it did not address issues calling for resolution by the exercise of judicial discretion. Therefore, *Dunkerley* is not controlling and imposes no limitations on the assistant judges' exercise of judicial discretion in passing on the acceptance or rejection of the Agreement proffered to the full court in this case. V.R.Cr.P. 54(c)(1)(ii) tracks *Dunkerley,* but goes one step further and permits the assistant judges to participate with the presiding judge in determining the facts involved "in mixed questions of law and fact, [however] [*a*]*pplication of the law to the facts so found* shall be determined by the Presiding Judge in each instance." (Emphasis added.) Thus, in order for Rule 54(c)(1)(ii) to govern a particular situation, there must be *facts* to find and *law* to apply. This is not the case in accepting or rejecting the Agreement here. Neither the State nor the defendant has suggested that the court should have made findings of fact when the Agreement was offered and rejected. Similarly they have nowhere suggested that any conclusions of law then be derived from facts found. Rule 54(c)(1)(ii) applies to situations such as a motion to suppress evidence where first facts must be found and then law applied. Accepting or rejecting the Agreement in the case at hand in-

volves nothing of this sort and, therefore, is not subject to the dictates of V.R.Cr.P. 54(c) (1) (ii).

We note that the Agreement considered below involved a reduction in the charge from first degree to second degree murder and a sentencing concession providing for a minimum term of ten years imprisonment, in exchange for a plea of guilty. The record discloses the following statement by the presiding judge:

> [A] majority of this Court has voted to reject the plea agreement, primarily in that part of the agreement that deals with the minimum sentence. And, therefore, the judgment of the Court is that the plea agreement as proposed is rejected.

Thus, the record indicates that the assistant judges focused on the minimum sentence, although of course their rejection went to the entire Agreement. In this context, their rejection of the Agreement was an exercise of judicial discretion. Neither the State nor the defendant argues that Rule 54(c) (1) (ii) or *Dunkerley* precludes the assistant judges from exercising judicial discretion.

 Judicial discretion was well defined by a federal court some years ago. " 'Discretion' of course means 'sound discretion,' not discretion exercised arbitrarily, but with due regard for that which is right and equitable under the circumstances, and directed by reason and conscience to a just result." *United States v. D'Argento*, 227 F. Supp. 596, 600 (N.D. Ill. 1964). Although *D'Argento* involved an exercise of discretion on a motion to set aside or remit a forfeiture of bail bond, we feel that its definition is applicable to this case.

 Our Court has previously identified the discretionary nature of accepting or rejecting pleas.

> While respondent . . . has no right to insist on the acceptance of a plea of guilty, the court, nevertheless, *in the exercise of its discretion*, has the power to accept such a plea, if it deems it wise to do so. A tendered or offered plea should not be refused without good reason but, if refused, must be shown that the court abused its discretion.

*State v. Reuschel, supra*, 131 Vt. at 561–62, 312 A.2d at 743

(emphasis added) (citation omitted). We see no. difference between the discretionary nature of accepting or rejecting a plea based on a plea bargain agreement and the discretionary nature of accepting or rejecting a plea based on other considerations. This is consistent with F.R.Cr.P. 11(e), after which Vermont's rule is patterned: "The plea agreement procedure does not attempt to define criteria for the acceptance or rejection of a plea agreement. Such a decision is left to the discretion of the individual trial judge." F.R.Cr.P. 11(e) 1975 advisory committee note (reprinted in 8 J. Moore, Moore's Federal Practice ¶ 11.01[4], at 11-16 (2d ed. 1983)); accord 8 J. Moore, Moore's Federal Practice ¶ 11.02[1], at 11-15 (2d ed. 1983). For a recent discussion of the discretionary nature of accepting or rejecting plea bargain agreements, see *United States* v. *Miller*, 722 F.2d 562, 563–66 (9th Cir. 1983) (remanded for failure to exercise discretion).

▮▮▮ There has been no allegation or showing of abuse of discretion by the assistant judges below. When the presiding judge in the case before us spoke of the rejection of the Agreement, he spoke for a majority of the court. A ruling such as this should reflect the discretion of the majority of the court unless specifically prohibited by the rule. Had the assistant judges decided a question of law, we would have an issue to decide under the rule. But the record reveals no rulings by the assistant judges on questions of law. Just because the presiding judge had reservations about the validity of some of his previous legal rulings at suppression hearings, we cannot conclude that V.R.Cr.P. 54(c)(1)(ii) barred the exercise of judicial discretion by the full court.

The American Bar Association Minimum Standards on Pleas of Guilty contain a list of considerations appropriate for application by the trial court in determining whether it should accept or reject a plea bargain agreement:

> (i) that the defendant by his plea has aided in ensuring the prompt and certain application of correctional measures to him;
>
> (ii) that the defendant has acknowledged his guilt and shown a willingness to assume responsibility for his conduct;
>
> (iii) that the concessions [as to the charge or sentence]

will make possible alternative correctional measures which are better adapted to achieving rehabilitative, protective, deterrent or other purposes of correctional treatment, or will prevent undue harm to the defendant from the form of conviction;

(iv) that the defendant has made public trial unnecessary when there are good reasons for not having the case dealt with in a public trial;

(v) that the defendant has given or offered cooperation when such cooperation has resulted or may result in the successful prosecution of other offenders engaged in equally serious or more serious criminal conduct;

(vi) that the defendant by his plea has aided in avoiding delay (including delay due to crowded dockets) in the disposition of other cases and thereby has increased the probability of prompt and certain application of correctional measures to other offenders.

ABA Minimum Standards § 1.8(a). It is interesting to note that there is not a single "legal issue" in the list suggested for the trial court to consider.

After returning to chambers to consider its decision, if the plea bargain agreement is to be rejected by the court, each of the judges participating in the proceeding should be prepared to declare later in open court, on the record, his or her reasons why, in the exercise of sound judicial discretion, he or she rejected the plea bargain agreement. *United States* v. *Miller, supra,* 722 F.2d at 566 (citing *United States* v. *Ammidown,* 497 F.2d 615, 623 (D.C. Cir. 1973)) ; *City of Akron* v. *Ragsdale,* 61 Ohio App. 2d 107, 109, 399 N.E.2d 119, 121 (1978).

In exercising judicial discretion in accepting or rejecting a plea bargain agreement, the presiding lawyer trained judge and the lay assistant judges each registers his or her independent judgment, based upon heritage, environment, education and a myriad of other influences including the Agreement itself and the record before the court. There is nothing in the legal training of the presiding judge which makes him or her more qualified than a lay judge to exercise discretion in considering a plea bargain agreement.

Based on the record we have before us and on the particular facts of this case, we cannot agree with the parties that

either *Dunkerley, supra,* or V.R.Cr.P. 54 (c) (1) (ii) was applicable and prohibited the assistant judges from exercising their discretion in rejecting the Agreement.

## II.

The next question is whether the rejection of the Agreement by lay assistant judges denied the defendant his constitutional rights to the effective assistance of counsel and to due process of law. Defendant is not actually making separate challenges under the two constitutional guarantees; the due process and ineffective assistance of counsel arguments are intertwined. Defendant does not argue that his counsel was ineffective or incompetent; he argues that it is impossible for *any counsel* to represent him effectively because the presence of the lay assistant judges violates due process. Thus, the crux of defendant's argument here revolves around the guarantee of due process.

Defendant insists he was deprived of these constitutional guarantees, citing *Dunkerley, supra,* in which we noted "the Assistant Judges must be disqualified from participation in the legal issues relating to trial." 134 Vt. at 526, 365 A.2d at 132. This was based on our recognition of the constitutional requirement that a defendant has a right to representation by a legally qualified attorney, and "[t]o require a lesser standard of judicial authority would be to defeat that constitutional purpose." *Id.* Defendant also cited the similar view expressed by the Indiana Supreme Court. "We cannot in good conscience concede . . . that less legal ability and knowledge is required of a judge than of the lawyers practicing before the judge." *In re Judicial Interpretation of 1975 Senate Enrolled Act No. 441,* 263 Ind. 350, 352, 332 N.E.2d 97, 98 (1975).

Defendant does not seek to eliminate completely the judicial powers of the assistant judges, but only to impose a limitation on those powers in situations in which the lay assistant judges are confronted with a plea bargain agreement which is fraught with complex constitutional and evidentiary issues. Defendant argues that the lay assistant judges effectively ruled that the resolution of these legal issues, reached by the defendant's attorney and the state's attorney and acceptable

to the presiding lawyer trained judge, was unacceptable to them. To permit two lay judges to overrule the lawyer trained judge and reject such an Agreement, defendant contends, undermines his right to effective assistance of counsel.

We note that defendant was represented by counsel at all stages of the proceedings below, that there was a lawyer trained judge on the bench, that there was a verbatim record of the proceedings, and that defendant could petition the superior court for permission to appeal the interlocutory ruling of the assistant judges, and, if denied, could petition the Supreme Court directly for permission to appeal. The Supreme Court consists of five lawyer trained justices and is empowered to hear such appeals.

The defendant has presented us with authority indicating a trend away from the use of lay judges based on due process considerations. In *Gordon* v. *Justice Court,* 12 Cal. 3d 323, 525 P.2d 72, 115 Cal. Rptr. 632 (1974), *cert. denied,* 420 U.S. 938 (1975), the California Supreme Court abolished that state's system of lay judges as violative of the Due Process Clause of the Fourteenth Amendment. The California court observed that "[w]hatever the justification for permitting laymen to preside over criminal trials in the 1800's, it is a well-recognized principle that even long-standing practices are subject to constitutional scrutiny and must meet the advancing standards of due process." *Id.* at 328, 525 P.2d at 75, 115 Cal. Rptr. at 635. In California, the lay judges presided alone and ruled on all issues at trial. The court in *Gordon* noted that "[w]e do not suggest that a fair criminal trial is impossible in a court presided over by a non-attorney judge, but only that the likelihood of such a trial would be substantially diminished." *Id.* at 329, 525 P.2d at 76, 115 Cal. Rptr. at 636. Assuming arguendo that the above statement by the *Gordon* court may be true, the defendant has not demonstrated any abuse of discretion on the part of the assistant judges in ruling as they did. The presence of the presiding lawyer trained judge in any event distinguishes the instant case from *Gordon*. *Dunkerley* and V.R.Cr.P. 54(c)(1)(ii) carefully limit the authority of assistant judges in Vermont. Thus, the situation in Vermont is distinguishable from that in California.

The United States Supreme Court decision in *North* v. *Russell,* 427 U.S. 328 (1976), while not directly on point, raised

issues similar to this appeal. There the defendant appeared before a single lay judge on a charge of first offense of driving under the influence of intoxicating liquor. Under Kentucky law the penalty on conviction of a first offense was a fine of $100 to $500; for a subsequent offense the fine was the same plus imprisonment for not more than six months. Defendant, who was not represented by an attorney, appeared and pled not guilty and asked for a jury trial to which he was entitled under Kentucky law. The lay judge denied defendant's request for a jury trial, found defendant guilty, sentenced him to thirty days in jail, fined him $150 and revoked his driver's license.

Kentucky law further provided the defendant with an absolute right of appeal with a trial de novo before a lawyer judge and a jury, and to bail while awaiting the trial de novo. Proceedings before the lay judge, however, were not recorded; thus there was no record for appeal. *North, supra,* 427 U.S. at 336 n.5 (citing *Colten* v. *Kentucky,* 407 U.S. 104, 114 (1972)). Although the lay judge had patently exceeded his judicial authority, defendant did not avail himself of a de novo trial on appeal but instead brought a writ of habeas corpus to contest his incarceration by a lay judge.

Chief Justice Burger, writing the opinion of the Court, stated:

> We conclude that the Kentucky two-tier trial court system with lay judicial officers in the first tier in smaller cities and an appeal of right with a *de novo* trial before a traditionally law-trained judge in the second does not violate either the due process or equal protection guarantees of the Constitution of the United States . . . .

427 U.S. at 339.

Defendant attempts to distinguish *North* from the situation at hand. He points to the absolute right of appeal from the lay judge's decision, with a trial de novo by jury in *North,* as opposed to only an appeal to the Supreme Court of Vermont from the ruling made by the lay assistant judges in rejecting a plea bargain agreement. Although Vermont law does not provide the defendant with a de novo appeal from the superior court as in *North,* it does provide the means for interlocutory appeal, V.R.A.P. 5, or an absolute right to an appeal from a final judgment of conviction to the Supreme Court of

Vermont where five lawyer trained justices sit. 13 V.S.A. § 7401; V.R.A.P. 4; *State* v. *Buck*, 139 Vt. 310, 314–15, 428 A.2d 1090, 1093 (1981). As previously mentioned, the Kentucky system reviewed in *North* made no record of the proceedings before the lay judge; thus there could be no appellate review of the proceedings. The superior courts in Vermont do make verbatim records of their proceedings, enabling this Court to review claims of error on appeal. Under these circumstances, the fact that *North* involved a de novo trial is not a sufficient ground to distinguish the case. Furthermore, in a case involving a sentence of life imprisonment or death, the appeal to this Court is automatic. V.R.A.P. 3(b). We also note that Vermont has provided for review of a defendant's sentence for a period of ninety days on motion of the defendant or of the trial court itself. 13 V.S.A. § 7042. These may be more cumbersome and costly procedures, but we hold that the presence of the lawyer trained presiding judge below, the limits on the authority of assistant judges in *Dunkerley, supra,* and V.R.Cr.P. 54, the availability of appeal, and the provision for sentence review bring this case within the due process parameters announced in *North*. Defendant's rights to effective assistance of counsel and due process of law were not violated.

### III.

Finally, defendant argues that because Vermont law allows criminal cases to be brought in either the district or superior courts, he is deprived of equal protection under the law. Defendant observes that in district court only a lawyer trained judge sits, whereas in superior court a lawyer trained judge sits with two lay judges. Since under current Vermont law, 4 V.S.A. §§ 114, 439, the state's attorney has discretion to decide whether to bring a criminal case in one of two courts, defendant argues that irrational classes of courts are established in violation of the equal protection clause of the Fourteenth Amendment of the United States Constitution.

The record in the instant appeal, however, indicates that at the time the State's information was filed on April 20, 1982, charging the defendant with murder in the first degree, the state's attorney could bring a murder case only in superior court. Defendant acknowledges this fact in his brief. At that time 4 V.S.A. § 439 provided: "The district court shall have

jurisdiction to try, render judgment and pass sentence in prosecutions for felon[ies] *wherein the maximum penalty is imprisonment for less than life."* (Emphasis added.) Defendant now attempts to rely on the amended 4 V.S.A. § 439 (effective July 1, 1982), which omits the emphasized language, thus enabling a state's attorney to elect between the district and superior courts when prosecuting a murder.

Since the state's attorney had no discretion as to where to bring the murder charge in this case, defendant was unaffected by the amendment to 4 V.S.A. § 439. This is analogous to the requirement of standing in a civil case. The principle was well stated in *Sandoval* v. *Ryan,* 535 P.2d 244, 246 (Colo. Ct. App. 1975): "The essence of standing is that no person is entitled to assail the constitutionality of an ordinance or statute except as he himself is adversely affected by it." Since the defendant was not adversely affected by any action of the prosecutor, he has no standing to attack the constitutionality of 4 V.S.A. §§ 114, 439 (as amended).

*The three certified questions are answered in the negative.*

**Peck, J.,** dissenting. This is the second case to come before the Court within a year involving the powers of our assistant (or lay) judges.[1] The first, *Soucy* v. *Soucy Motors, Inc.,* 143 Vt. 615, 471 A.2d 224 (1983), involved their equity powers under existing statutes. The instant case, like *State* v. *Dunkerley,* 134 Vt. 523, 365 A.2d 131 (1976), before it, involves the powers of assistant judges in criminal cases under the United States Constitution. I believe that the controversy which developed following the *Soucy* decision, coupled with the serious nature of the offense charged here, has affected today's result. If this case had come before us at the time *Dunkerley* was decided, the result here would have been different, of that I am certain. Today's decision is not one which addresses a new question left open by *Dunkerley,* as the majority would persuade us. On the contrary, it is a retreat from the constitutional guarantees laid down so clearly in that case.

---

[1] Since there are currently no assistant judges who are lawyers, the terms "assistant judges" and "lay judges" are used interchangeably throughout this dissent. The phrase "presiding judge" in this dissent means a lawyer-trained superior judge.

The legislature, long ago, stripped justices of the peace of judicial powers because, as such, they were not trained or otherwise qualified to perform those functions. Why it is that this Court, reversing the progressive course started in *Dunkerley,* has fled back across the Rubicon to *expand* the powers of assistant judges, who are equally unqualified, I am at a loss to comprehend.

## I.

## DISCRETION

The holding in *Dunkerley,* that assistant judges may not participate in issues of law in criminal cases, is evaded here by broad and simplistic generalizations. Among these, the majority contends that, ultimately, the entire problem reduces to no more than an exercise of judicial discretion with no questions, either of law or fact, involved at all. The premise is wrong to begin with for at least two reasons.

## A.

## JUDICIAL DISCRETION IS A MATTER OF LAW PER SE

The majority undertakes to define "judicial discretion" by accepting, without analysis, the statement of a federal district court in 1964: " 'Discretion' . . . means 'sound discretion,' not discretion exercised arbitrarily, but with due regard for that which is right and equitable under the circumstances, and directed by reason and conscience to a just result." *United States* v. *D'Argento,* 227 F. Supp. 596, 600 (N.D. Ill. 1964). This definition is appropriate enough in the context of the case in which it appears. There was no need to address the legal aspects of judicial discretion; it was not an issue, and certainly it did not involve lay judges. In fact, not a single one of the decisions from other jurisdictions dealing with judicial discretion, cited in support of the majority opinion, involve lay judges. The legal ramifications of judicial discretion are neither acknowledged or discussed; they are simply ignored notwithstanding their clear significance. They should have been addressed at least, and explained away if possible.

No less a tribunal than the United States Supreme Court

had occasion to recognize that "law" is an integral part of judicial discretion. Stating a definition, virtually identical to the definition relied on by the majority, except for the element that is the true key to the case at bar, the Supreme Court said:

> When invoked as a guide to judicial action it [discretion] means a sound discretion, that is to say, a discretion exercised not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances *and the law,* and directed by the reason and conscience of the judge to a just result.

*Langnes* v. *Green,* 282 U.S. 531, 541 (1931) (emphasis added).

It is not clear why the majority has elected to ignore the most important element of judicial discretion as it relates to this case. The decisions by this Court and courts of other jurisdictions that do not include the legal element of judicial discretion cannot be relied on as holding it is not an element, but only that it was not a concern in those cases.

On the other hand, where it has been deemed appropriate to address the question, the cases are legion, indeed I would venture to say they are nearly unanimous, in incorporating the legal element into their definitions. Thus:

> *It is well settled* that discretion means *legal* discretion, in the exercise of which *the judge must take account of the law applicable* to the particular circumstances of the case and be governed accordingly. If the trial judge misconceives the applicable law or misapplies it to the factual complex, in total effect the exercise of legal discretion lacks a foundation and becomes an arbitrary act.

*State* v. *Steele,* 92 N.J. Super. 498, 507, 224 A.2d 132, 136–37 (1966) (emphasis added). In an early opinion written by Chief Justice John Marshall, the United States Supreme Court held:

> Courts are the mere instruments of the law, and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and, when that is discerned, it is the duty of the Court to follow it. Judicial power is never exercised for the purpose of giving

effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law.

*Osborn* v. *United States Bank,* 22 U.S. (9 Wheat.) 738, 866 (1824). " '[D]iscretion' means *legal* discretion, in the exercise of which the trial judge must take account of the law applicable to the particular circumstances of the case and be governed accordingly." *Vorhies* v. *Cannizzaro,* 66 N.J. Super. 551, 558, 169 A.2d 702, 706 (1961). Discretion contemplates "a conclusion based on a logical rationale founded upon proper *legal standards.*" *McCleary* v. *State,* 49 Wis. 2d 263, 277, 182 N.W.2d 512, 519 (1971) (emphasis added). Discretion means a *legal discretion* to be exercised in discerning the course prescribed by law *according to principles established by the adjudicated cases. First National Bank* v. *Henshaw,* 169 Okla. 49, 53, 35 P.2d 898, 902–03 (1934). It means a *legal discretion,* controlled and limited by sound *principles of law applied to the facts. Nashville Grain Exch.* v. *United States,* 191 F. 37, 39 (Comm. Ct. 1911). Discretion is a *legal discretion,* guided and controlled by fixed *legal principles. Griffin* v. *State,* 12 Ga. App. 615, 621, 77 S.E. 1080, 1083 (1913). It is not a personal discretion, but a legal discretion exercised according to principles of law. *People* v. *Gage,* 188 Mich. 635, 642, 155 N.W. 464, 467 (1915). Discretion means a judicial discretion calling for the invocation by a *"trained mind"* producing a result in conformity to law. *Bartley* v. *Phillips,* 317 Mass. 35, 42, 57 N.E.2d 26, 30 (1944). The exercise of discretion means the *"application of statutes and legal principles to all of the facts of a case." Shopiro* v. *Shopiro,* 153 P.2d 62, 66 (Cal. App. 1944) (emphasis added).

I suggest that if every decision which does not include law in its definition of discretion can be cited as authority for the proposition that it is *not* an element, we may have the most comprehensive split of authority in judicial history.

I conclude, and I find the vast majority of courts, and probably all courts now, excepting, apparently, Vermont, agree that judicial discretion means legal discretion. It contemplates the understanding and application of legal standards, principles of law, and of adjudicated decisions. It envisions the exercise of this discretion by a law-trained judge. The Supreme

Court of Indiana stated, in addressing the subject of lay judges: "We cannot in good conscience concede . . . that less legal ability and knowledge is required of a judge than of the lawyers practicing before the judge." *In re Judicial Interpretation of 1975 Senate Enrolled Act No. 441*, 263 Ind. 350, 352, 332 N.E.2d 97, 98 (1975). The assistant judges, who are neither trained nor qualified, were confronted here with the determination and application of the law and legal standards and principles. Not only did they participate in the ruling, they overruled the presiding judge. In asserting a jurisdiction they never had, they violated the defendant's fundamental constitutional right to due process. Discretion in the judicial sense does not exist in a vacuum; it is inextricably bound up with the law and the application of the legal standards and principles as the cases cited above indicate.

## B.

### SPECULATION AND THE NATURE OF MIXED QUESTIONS

Both parties argued on appeal that the acceptance or rejection of a plea agreement involves mixed questions of law and fact and, therefore, since questions of law are involved, albeit they may be mixed, participation by the assistant judges is prohibited by *State* v. *Dunkerley, supra*. The majority rejects this argument on the grounds, as I understand the opinion, that, in this case at least, there was no question of law (pure or mixed) to be resolved in the acceptance process; it was entirely a matter of nonlegal discretion of the kind any layman might exercise. In addition to my view discussed above, that *all* judicial discretion involves the application of legal standards and principles, I have two objections to the majority's argument.

At the outset, it is an unsupported conclusion. The majority simply *assumes* that preliminary evidentiary rulings cleared the way for a pure act of discretion; no question of law could possibly remain. This is naked speculation, nothing more. Appellate courts are, necessarily, tied to the record transmitted from the lower court. They cannot make findings of fact—indeed if the findings below are inadequate the judgment must be reversed—nor can they speculate outside of the rec-

ord as to what happened or did not happen, or what was raised or not raised, below. Nevertheless, that is exactly what the majority has done. The opinion is really saying that the majority cannot *visualize* any question of law (pure or mixed) which might have arisen and been resolved at the *in camera* confidential discussion between the judges when they acted on the agreement. There is no transcript of these discussions, nothing; a void which the majority fills by speculating when the true situation is that we do not know. Therefore, I believe there is no basis for concluding that the decks had been cleared for a pure discretionary action.[2]

Secondly, I believe the majority fails to understand the nature of mixed questions of law and fact. They are not like apples and oranges mixed together in a basket, each unit of which may be identified as one or the other and separated out. A mixed question is analogous to a crossbred animal. In the latter instance there is but one animal, not two. In the former there is but one question, although it contains elements of law and elements of fact. That, I think, is what the parties are arguing, and they are right. Quite apart from the nature of judicial discretion itself, when the question before the court was whether to accept or reject the agreement, *that* question in itself was an inseparable mixture of the standards and principles of law to be applied to the fact of the proposed agreement and other surrounding facts. Therefore, the fact that the ruling was discretionary is immaterial. The ruling embraced a question of law; therefore, the action of the assistant judges was beyond their jurisdiction.

In view of the above discussion I think it is clear that in overruling the presiding judge and rejecting the plea agreement, the assistant judges exceeded their powers. In doing so, the defendant's fundamental right to due process has been violated. This is not a case of first impression; it is a clear progeny of *Dunkerley,* and the result is contrary to the constitutional protections defined in that case.

---

[2] There is nothing in the record either from which this Court can determine who made the decision on the motion to suppress. It would be unsupported speculation to conclude that, because it was a question of law, it was made by the presiding judge alone. In the absence of a record it may be speculated, with equal validity, that because the assistant judges were present, they participated.

## II.

## THE "SENTENCING" ARGUMENT

The majority argues next that in rejecting the "entire agreement" the assistant judges focused *only* on its sentencing aspect. The obvious flaw in this argument is that the case was not yet at its dispositive phase. The majority and the amicus brief filed on behalf of the assistant judges seem unable to make this distinction. At the point the lay judges saw fit to act as they did, the only issue before the court was the acceptance or rejection of the agreement. But this issue involved questions of law, whether mixed or not, as well as legal principles. See § I, *supra*. There is nothing magic about the lay judges' "focus" on a phase of the case that had not been reached that exempts their action from the ruling in *Dunkerley* prohibiting their participation in rulings on matters of law.

It is true that the acceptance of a plea agreement by the presiding judge acting alone may dilute in whole or in part, depending on the terms of the agreement, the sentencing powers of the assistant judges (assuming they exist).[3] However, their analogous powers to make findings of fact are likewise diluted by the exclusion of evidence by the presiding judge that they might have chosen to hear. To hold that assistant judges have the powers claimed here merely because of another power which *may* arise at a later time is equivalent to saying that they must equally have the discretionary power to rule on the admissibility of evidence simply because they would, thereafter, have the power to base findings of fact on that evidence.

I disagree with this, and with any attempt to break down the acceptance or rejection of a plea agreement into separate compartments based on law and fact (or a mixture thereof), or on "focus," considered in a vacuum. A ruling on a plea agreement incorporates the entire agreement and all of its aspects. Because such a ruling involves a mixed question and an act of judicial discretion, the person(s) making the decision must possess, above all, the qualifications to interpret, and apply the law and legal principles. However much they may protest, lay judges do not have that essential qualification;

---

[3] The power of lay judges to participate in sentencing is not an issue in this case, although it has been questioned elsewhere.

lacking that, they lacked the power to rule as they did. Their action was contrary to our holding in *Dunkerley,* and a violation of V.R.Cr.P. 54(c) (1) (ii).

## III.

## AUTHORITIES

It is evident that the majority has been unable to find any precedential authorities to support its position other than by reference to a case containing an incomplete definition of "discretion." Nevertheless, in its effort to bolster the result, the majority relies on such cases as *Gordon* v. *Justice Court,* 12 Cal. 3d 323, 525 P.2d 72, 115 Cal. Rptr. 632 (1974), *cert. denied,* 420 U.S. 938 (1975), and *North* v. *Russell,* 427 U.S. 328 (1976). This attempt fails in the face of any careful analysis, and regardless of the effort to distinguish them, the attempt only serves to emphasize that they provide inescapable support for the contrary view espoused by this dissent.

In *Gordon,* the Supreme Court of California abolished the state's system of lay judges as violative of due process. Nevertheless, the majority points out that under the California system the lay judges presided alone, with power to rule on all issues at trial (law as well as fact), whereas, in Vermont, the lay judges must always sit with the presiding judge.

That this distinguishing feature can and does break down is graphically illustrated by the case at bar. If, as it appears here, our lay judges have the power to overrule the presiding judge on questions of law, simply because of a mix with questions of fact, there are, for all practical purposes, no distinctions at all to the extent of those rulings between the abolished California system, and cases that come before Vermont's triumvirate superior courts. That, of course, is precisely what has happened here, and why, to that extent, the distinguishing feature fails to stand up, and why *Gordon,* in holding the lay judge system violates due process, supports the identical due process claim made here by both defendant and the State. It is interesting certainly, if not indeed instructive, that the United States Supreme Court denied certiorari in *Gordon.*

Further, the majority attempts to counter the statement of the California court that the likelihood of a fair trial is substantially diminished when conducted by lay judges, *Gordon,*

*supra*, at 329, 525 P.2d at 76, 115 Cal. Rptr. at 636, by saying that defendant here has not demonstrated any abuse of discretion on the part of the assistant judges in ruling as they did. Apart from the virtual impossibility of such a showing, this is irrelevant. In plea bargaining matters, the constitutionality issue hinges on jurisdiction: the authority or right to act at all. Very simply, they had no authority to act; therefore, the *manner* in which they did act is a smoke screen which should not be in the case.

I do agree with the majority that the United States Supreme Court decision in *North* v. *Russell, supra,* is not directly in point. I would go far beyond that: it is a red herring; it is not in point at all. In that case, as the majority points out, a person charged with driving under the influence of intoxicating liquor was subject to an initial trial before a lay judge alone who was authorized to rule on issues of both fact and law. Nevertheless, the Supreme Court held that fact, by itself, was not fatal, because, under the law of the state involved, if the suspect was convicted, he then had *an absolute right* to a new trial before a lawyer judge.

This distinction seems to me so obvious that reliance on *North* by the majority is badly conceived notwithstanding the rationale employed to explain it away. In fact, *North* provides legitimate support for defendant and the State. In order to have either precedential or instructive value for purposes of this case, a defendant would have to have an absolute right to a new acceptance hearing before a lawyer-trained judge alone whenever the assistant judges overruled the presiding judge. I would point out also that whatever right the defendant in *North* may have had to appellate review on issues of law had nothing whatever to do with his right to be tried before a lawyer-trained judge. The key to *North* is the de novo right, not the right to review by an appellate court. Since, unlike *North*, defendant here (and others in a similar situation) have no corresponding absolute right to a hearing de novo before a lawyer-trained judge alone, the case does not support the majority view. Indeed, it is implicit in *North* that if the absolute right to a trial de novo before a lawyer-trained judge did not exist, the result would have been different.

The majority's attempt to distinguish *North* on the grounds that the mere presence of the lawyer-trained judge below, and

the *Dunkerley* limits on the powers of assistant judges, coupled with the right of appeal to this Court before five lawyer-trained justices, "bring this case within the due process parameters announced in *North*," fails for substantially the same reasons that the majority analysis of *Gordon* is flawed. As long as the assistant judges are given the powers to decide questions of law (pure or mixed) independently of the rulings of the presiding judge, the latter's mere presence is meaningless, as is the right of appeal, since this Court has, by today's decision, granted to assistant judges the very power that has been challenged: the right of lay judges to rule on questions having legal implications. That issue is no longer appealable. The only thing left to a defendant now is an appeal based on an abuse of discretion. However, that is a practical impossibility in plea agreement cases, because, as noted above, the deliberations of the trial court are conducted in secret. Cf. *Slayton* v. *Ford Motor Co.*, 140 Vt. 27, 33, 435 A.2d 946, 949 (1981) (Billings, J., dissenting, based in part on the impossibility of determining whether the jury, which also deliberates in secret, was prejudiced by a controversial instruction). Moreover, there is no right to findings of fact or to conclusions of law even if they had been requested.

The majority also cites *Santobello* v. *New York*, 404 U.S. 257 (1971), for the proposition that a court may reject a plea agreement in the exercise of sound judicial discretion. *Id.* at 262. *Santobello* does not support the majority for several reasons. It is distinguishable on its facts; the decision did not involve lay judges. Moreover, the case does not undertake to define discretion as that term is applied to courts, i.e., as embracing legal concepts. There was no need to do so; consequently there is reason to suppose that it is in a different context.

There is not one single case cited by the majority, except those which, in fact, support this dissent, that involve lay judges, or contain definitions which address the key issue in this case; accordingly, they are not in point. And finally, the offhand rejection of V.R.Cr.P. 54(c)(1)(ii) as applicable to plea agreements is beyond comprehension. An act of judicial discretion was involved; that means a *legal* discretion. On the other hand the record provides absolutely no support for the

majority assertion that there were no questions of law resolved, or remaining to be resolved, at the discussion in chambers.

I conclude the majority opinion is entirely lacking in any valid support from the cases cited and from the rules.

## IV.

### EFFECTIVE ASSISTANCE

Defendant argues that rejection of the plea agreement by the assistant judges served to deny him his constitutional rights to the effective assistance of counsel and due process of law. The basis of the objection, founded primarily on this Court's decision in *Dunkerley, supra,* is adequately stated in the majority opinion (q.v.) ; accordingly, it need not be repeated here in full. Nevertheless, I am in complete accord with defendant's position on the issue. Further, because the cases are so clearly and strikingly in point, I would remind the majority of the holding of the Indiana Supreme Court, quoted earlier in this opinion, relating to the legal knowledge and ability required of judges vis-a-vis attorneys, in *In re Judicial Interpretation of 1975 Senate Enrolled Act No. 441, supra,* and of the California Supreme Court in *Gordon, supra,* at 328, 525 P.2d at 75, 115 Cal. Rptr. at 635: "Whatever the justification for permitting laymen to preside over criminal trials in the 1800's, it is a well-recognized principle that even long-standing practices are subject to constitutional scrutiny and must meet the advancing standards of due process."

The opinion recites both of these statements, but sloughs them off with an argument that is spurious and hollow at best. In effect, the majority expects us to accept the proposition that the mere presence of the presiding judge below, and the right of appeal to this Court, consisting of five lawyer-trained justices, is adequate. As pointed out above, this argument not only begs the question, it does not even address it. Once the assistant judges are given the power, conferred upon them today by the majority, to rule on questions of law, however limited the right may be, that issue is dead; it is not appealable nor will the presence of the presiding judge below resolve anything since he is subject to the untrained and unqualified predilections of laymen who may now overrule him at will on plea agreements. I reiterate: the underlying issue to be exam-

ined here in its constitutional dimensions is jurisdiction. Justification for the majority view that fails to address the jurisdiction to make decisions is not in point; it speaks to a manufactured issue, and is entirely irrelevant to the constitutional issues which are before us.

Of course defendant has been denied the effective assistance of counsel. How can it be otherwise? Rulings on the legal issues inherent in the acceptance or rejection of plea agreements are in the hands of the untrained and unqualified, and defense counsel is helpless in the face of it. Counsel cannot even formulate a meaningful abuse of discretion claim because the deliberations which lead to the decisions are conducted behind closed doors.

It is disturbing that the majority pays lip service to the limitations placed on the authority of assistant judges by *Dunkerley* as additional support for its decision, when, in fact, the very express prohibitions, presumably established by that case, are brought to nothing for this defendant and for others who may be in similar circumstances hereafter. We should be under no complacent illusions: that is exactly what has occurred today. This Court is satisfied that less legal ability is required of assistant judges to the extent they are empowered to act independently than of the lawyers practicing before them. Cf. *In re Judicial Interpretation, supra.* Enhancing the powers of lay judges, at the expense of the constitutional right to due process of defendants caught in the toils of criminal law, is the unfortunate consequence of today's decision. I believe that assistant judges are not trained or otherwise qualified to exercise the legal discretion called for in this case. On the other hand, as the Supreme Court of California has stated, while fairness is not impossible in matters which may be controlled by lay judges, the likelihood is substantially diminished. *Gordon* v. *District Court, supra,* at 329, 525 P.2d at 76, 115 Cal. Rptr. at 636. Courts must always have in mind and resist the temptation to respond to public pressure when a serious crime is involved; any other course approaches vigilante law. There will be others charged in the future with serious or minor offenses; in some cases the defendant will indeed be innocent. But what the majority has done today will affect the right of every person from this day on.

I would reverse and remand for a new hearing on the plea

agreement before a superior judge sitting alone. That is the only remedy which can assure this defendant, and others to come, that their due process rights are of more concern to the Vermont judicial system than are the secondary concerns of the judges who are a part of the system.